IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BRITTNEY SAYRE, ) | CASE NO.  1:20-CV-01400-JDG |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | MAGISTRATE JUDGE |
| ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | **MEMORANDUM OF OPINION AND** |
| Defendant, ) | **ORDER** |
| ) | |

Plaintiff, Brittney Sayre ("Plaintiff" or "Sayre"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i),

423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent

of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's

final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT

WITH THIS OPINION.

## I.    PROCEDURAL HISTORY

In August 2017, Sayre filed an application for SSI alleging a disability onset date of August 10,

2017 and claiming she was disabled due to partial amputation/23 surgeries on her right foot, fibromyalgia,

osteochorditis, protruding disc in her neck, and kyphosis.  (Transcript ("Tr.") at 16, 124-25.)  The

application was denied initially and upon reconsideration, and Sayre requested a hearing before an

administrative law judge ("ALJ").  (*Id.* at 16.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

On March 20, 2019, an ALJ held a hearing, during which Sayre, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On May 1, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 16-33.)  The ALJ' s decision became final on April 29, 2020, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On June 25, 2020, Sayre filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13-15.)  Sayre asserts the following assignments of error:

(1) The ALJ committed harmful error when she failed to properly apply the doctrine of *res judicata*.

(2) The ALJ erred when she failed to properly evaluate the cumulative evidence in the record.

(3) The ALJ erred when she did not meet her burden at Step Five of the Sequential Evaluation.

(Doc. No. 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Sayre was born in August 1992 and was 26 years-old at the time of her administrative hearing (Tr. 16, 29), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c). She has at least a high school education and is able to communicate in English.  (*Id.* at 29.)  She has no past relevant work.  (*Id.*)

### B.    Relevant Medical Evidence[2]

A November 10, 2010 Individualized Education Plan ("IEP") documented the difficulties Sayre had while in school, including migraines which caused her to be hospitalized, major depressive disorder

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

recurrent with psychotic features, generalized psychotic disorder, and bulimia nervosa.  (Tr. 297.)  Sayre qualified for special education services due to a learning disability in reading and written expression.  (*Id.* at 298.)  Sayre had difficulty in her ability to sustain comprehension, short term memory, and concentration.  (*Id.*)  Sayre also suffered from "severe anxiety."  (*Id.* at 299.)  However, she measured proficient on all of the Ohio Graduation Tests.  (*Id.*)

From April 2015 through August 2017, Sayre met with a case manager and other clinicians from The Centers for Families and Children.  (*Id.* at 335-97.)  She continued to meet with them approximately weekly after filing her current application for SSI benefits.  (*Id.* at 397-419.)

On May 7, 2015, Sayre underwent a psychiatric evaluation.  (*Id.* at 432.)  Sayre reported depression, anxiety, and some bipolar symptoms.  (*Id.*)  She stated her last psychiatrist had diagnosed her with bipolar disorder, anxiety, and major depression.  (*Id.*)  She could not remember what medication she had been prescribed.  (*Id.*)  Sayre endorsed anhedonia, low energy, low frustration tolerance, poor concentration, and poor appetite.  (*Id.*)  Sayre also reported frequent suicidal thoughts but no plan.  (*Id.*)  She stated she had two past suicide attempts.  (*Id.*)  Sayre further endorsed hearing noises others did not hear, flashbacks, intrusive memories, nightmares, hypervigilance, startling easily, excessive worry, panic attacks, and some anxiety in crowds and small spaces.  (*Id.*)  Sayre reported living with her mother.  (*Id.* at 433.)  She stated she had tried to work but could not because of her foot.  (*Id.*)  Treatment providers diagnosed Sayre with major depressive disorder recurrent moderate and PTSD.  (*Id.* at 435.)

On July 11, 2016, Sayre saw Kelley Kauffman, RN, NP.  (*Id.* at 438.)  Sayre reported that her depression could reach a 10/10 and she isolates herself and cries "like a baby."  (*Id.*)  Kauffman noted Sayre's situation was worse.  (*Id.* at 439.)  Kauffman determined Sayre had "[i]ncreased depression with possible psychosis" and that it was "[u]nclear if these symptoms were related to mood or separate etiology."  (*Id.*)  Kauffman started Sayre on Seroquel for improved symptom management.  (*Id.*)

3

On August 10, 2016, Sayre saw Kauffman for follow up.  (*Id.* at 440.)  Sayre told Kauffman she was "'good.'"  (*Id.*)  Sayre reported Seroquel had helped her irritability and her sleep but that she was still depressed.  (*Id.*)  Sayre rated her depression as a 7/10 and her anxiety as a 5-6/10.  (*Id.*)  Sayre reported her appetite had been poor, and she had been eating only one meal a day.  (*Id.*)  Kauffman found Sayre presented as "depressed and anxious," although there was some improvement in her irritability.  (*Id.* at 441.)  Kauffman increased Seroquel for improved symptom management.  (*Id.*)

On September 12, 2016, Sayre saw Kauffman for follow up.  (*Id.* at 442.)  Sayre reported Seroquel had helped her anger, and she felt her anxiety was less.  (*Id.*)  She again rated her depression as a 7/10, although she endorsed more good days than bad days.  (*Id.*)  Sayre reported she was seeing a podiatrist the next day to see if there was anything to be done to fix her foot.  (*Id.*)  Kauffman noted Sayre had continued depression and anxiety although Sayre perceived improvement.  (*Id.* at 443.)  Kauffman continued Sayre's medication.  (*Id.*)

On October 18, 2016, Sayre underwent a pre-surgical evaluation at MetroHealth ahead of her November 10, 2016 surgery.  (*Id.* at 482.)   On examination, Sheena Settlemires, CNP, found no gross or obvious abnormalities of the extremities, no motor deficits, intact sensation, and no gross or obvious abnormalities on visible skin.  (*Id.* at 483.)

On November 10, 2016, Sayre underwent a Weil osteotomy without fixation on the second metatarsal of the right foot, arthrodesis in the proximal interphalangeal joint on the second toe of the right foot, V-Y skin plasty on the fifth metatarsophalangeal joint of the right foot, and a capsulotomy on the fifth metatarsophalangeal joint of the right foot.  (*Id.* at 472-476.)  Lisa Roth, DPM, noted Sayre understood she could not make her foot perfect but was looking to make small changes so that Sayre's foot could be more functional and less painful with shoe gear.  (*Id.* at 477.)

On February 3, 2017, Sayre saw Kauffman for follow up.  (*Id.* at 447.)  Sayre reported she was

4

"'in a lot of pain.'"  (*Id.*)  Sayre said she had recovered from foot surgery, which had helped with her mobility but not her pain, and she was now having issues with some of her other toes.  (*Id.*)  Kauffman determined Sayre had "[c]ontinued depression related to psychological stressors."  (*Id.* at 448.)  Kauffman continued Sayre's medications and referred her to a neurologist "for assessment of traumatic brain injury and how this may be affecting her mood/behavior."  (*Id.*)

On March 6, 2017, Sayre saw Kauffman for follow up.  (*Id.* at 449.)  Sayre reported she had been all right and was doing a little bit better.  (*Id.*)  She told Kauffman she had not scheduled an appointment with the neurologist or with a counselor yet.  (*Id.*)  Sayre reported her sleep had been okay.  (*Id.*)  Kauffman noted Sayre continued to have anxiety and depression, as well as impulsivity.  (*Id.* at 450.)  Kauffman suspected Sayre's impulsivity was "partially related" to her traumatic brain injury and partially due to her history of trauma.  (*Id.*)

On May 2, 2017, Sayre saw Theresa Backman, NP, for follow up.  (*Id.* at 452.)  Sayre complained of a lot of migraines lately, as well as nausea and vomiting that went away when she took Seroquel.  (*Id.*)  However, Sayre no longer wanted to take Seroquel.  (*Id.*)  Sayre reported her mood was better, but she had been having side effects from her medications.  (*Id.*)  She was sleeping six to seven hours a night.  (*Id.*)  Her appetite had been okay, but she had been throwing up every day for the past few months.  (*Id.*)  Sayre also reported her energy was very low.  (*Id.*)  Backman decreased Seroquel and instructed Sayre to taper off of it as tolerated.  (*Id.* at 453.)  Backman continued the rest of Sayre's medications.  (*Id.*)

On May 5, 2017, Sayre saw neurologist Dr. Alessandro Serra for evaluation of her migraine headaches.  (*Id.* at 617.)  Sayre complained of headaches that started at her right temple and extended to the other side, sometimes with a gradual onset, and with a pulsating pain that could be 10/10.  (*Id.*)  Sayre denied sensitivity to light or sound but endorsed nausea and vomiting.  (*Id.*)  Sayre reported her headaches had been worse for the past two months, complaining of nausea and vomiting every day, occasional

double vision and blurred vision, weakness, and flashes of light in her vision.  (*Id.*)  Sayre endorsed a 10/10 headache while in the office, but Dr. Serra noted she was talking and using her phone.  (*Id.*)  Sayre reported she had not eaten much in the past two weeks because of nausea and vomiting and had lost four pounds.  (*Id.*)  While Sayre's Seroquel dose had been reduced, she had not noticed any change in her headaches yet.  (*Id.*)  Sayre denied any symptoms of incoordination or difficulty walking.  (*Id.* at 618.)  On examination, Dr. Serra found no tenderness to percussion over the spine, normal muscle strength of the upper and lower extremities, positive Hoffman's sign on the left upper extremity, intact coordination in the arms and legs, normal sensation and Romberg's test, and normal gait.  (*Id.* at 619-20.)  Dr. Serra diagnosed Sayre with migraine headaches, myelopathy, and neck pain.  (*Id.* at 620-21.)  Dr. Serra ordered MRIs of the brain and cervical spine, and prescribed Imitrex for migraine attacks and propranolol for prevention.  (*Id.* at 621.)

A May 20, 2017 cervical MRI revealed minimal posterior disc bulges at the C2/3, C3/4, and C4/5 levels, and a mild posterior disc bulge at C5/6.  (*Id.* at 429.)  The overall impression was "mild multilevel cervical spondylosis."  (*Id.*)

On July 19, 2017, Sayre saw Kauffman for follow up.  (*Id.* at 456.)  Sayre reported she was doing a lot better than the week before, when she was not sleeping more than two hours a night because of anxious and ruminating thoughts and family problems.  (*Id.*)  Sayre told Kauffman this week she had been sleeping better.  (*Id.*)  Sayre reported reducing her caffeine intake helped her anxiety.  (*Id.*)  Kauffman noted Sayre continued to struggle with emotional regulation, which Kauffman suspected was related to stressors, traumatic brain injury, and trauma history.  (*Id.* at 457.)  Kauffman restarted Sayre on Seroquel at Sayre's request, but kept it at a low dose.  (*Id.*)

On September 21, 2017, Dr. DiLisi had completed a Physical Medical Source Statement.  (*Id.* at 602-05.)  Dr. DiLisi listed Sayre's diagnoses as fibromyalgia, bipolar disorder, and right foot deformity

post-accident, and described Sayre's prognosis as fair.  (*Id.* at 602.)  Sayre's symptoms included numbness/tingling, foot pain, and fatigue, as well as daily diffuse and positional pain.  (*Id.*)  Dr. DiLisi noted Sayre "indicates [she] walks less than a block."  (*Id.* at 603.)  Dr. DiLisi opined Sayre could sit for five minutes at a time and stand for five minutes at a time, and she could sit and stand/walk for a total of less than two hours in an eight-hour workday.  (*Id.*)  Dr. DiLisi further opined Sayre needed a job that allowed her to alternate positions at will, and Sayre would need to walk around every hour for five minutes each time.  (*Id.*)  Sayre would need to take hourly unscheduled breaks for five minutes at a time because of pain, paresthesias, or numbness.  (*Id.*)  Dr. DiLisi also opined Sayre would need to elevate her legs to heart level 50% of the time in an eight-hour workday because Sayre "reports R foot numbness and discoloration of legs."  (*Id.* at 604.)  Dr. DiLisi further opined Sayre could never lift even less than 10 pounds because of back pain.  (*Id.*)  Sayre could never twist, stoop, crouch/squat, or climb ladders, although she could rarely climb stairs.  (*Id.*)  Dr. DiLisi opined Sayre had "significant limitations" with reaching, handling, and fingering, and could never reach overhead.  (*Id.*)  Dr. DiLisi deferred to Sayre's psychiatrist for time off task and Sayre's ability to handle work stress.  (*Id.* at 605.)  Sayre's impairments would cause good days and bad days, and Dr. DiLisi opined Sayre would miss more than four days of work a month because of her impairments.  (*Id.*)

On September 29, 2017, Kauffman completed a Mental Impairment Questionnaire.  (*Id.* at 608-09.)  Kauffman listed Sayre's diagnoses as major depression recurrent and PTSD.  (*Id.* at 608.)  Kauffman described Sayre's prognosis as unclear and noted her memory continued to worsen.  (*Id.*)  Kauffman opined Sayre had no useful ability to function in the following areas: maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; understanding and remembering detailed instructions; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to

changes in the work setting.  (*Id.* at 608-09.)  Kauffman further opined Sayre would be unable to meet competitive standards in the following areas: carrying out detailed instructions; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; performing at a consistent pace without an unreasonable number and length of rest periods; remembering locations and work-like procedures; understanding and remembering very short and simple instructions; interacting appropriately with the general public; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (*Id.*)  Kauffman further opined Sayre's abilities were seriously limited, but not precluded, in the following areas: carrying out very short and simple instructions; performing activities within a schedule; managing regular attendance and being punctual within customary tolerances; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; and setting realistic goals or making plans independently of others.  (*Id.*)  Sayre would be off task more than 25% percent of an eight-hour workday and would miss more than four days of work per month.  (*Id.* at 609.)

On November 17, 2017, Sayre saw Dr. Serra for follow up regarding her migraines and chronic headaches.  (*Id.* at 613.)  Sayre complained of daily headaches that felt like someone was hitting her over the head with a frying pan.  (*Id.*)  Sayre described the pain as sharp and lasting for hours, with Imitrex not helping much.  (*Id.*)  The pain moved to the front and back of her head and felt like pressure.  (*Id.*)  Sayre reported getting two of her typical migraines a week where she had to lay down in the dark.  (*Id.*)  Sayre also reported continued neck pain that went down to her shoulders and upper back.  (*Id.*)  Dr. Serra noted Sayre reported having a headache that she rated as an 8/10, but Sayre appeared in no major distress.  (*Id.*)  On examination, Dr. Serra found normal muscle strength of the upper and lower extremities, positive Hoffman's sign on the left upper extremity, intact coordination in the arms and legs, and normal gait.  (*Id.*

at 615.)  Sayre's diagnoses included cervicalgia, fibromyalgia, and migraine headaches.  (*Id.*)  Dr. Serra

wrote:

> 25 yo woman with prior motor vehicle accident and long standing hx of migraines, not responding to propranolol 80 daily. She also has chronic headaches, likely tension type, and neck pain, fibromyalgia. Her headaches and chronic pain appear to be multifactorial. MRI brain and C-spine w/o significant abnormalities. Besides her known hyperreflexia, her exam remains non focal.
>
> I will increase propranolol to 120 mg daily, but her headaches are complicated for me to manage at this point, so I will refer her to Dr. Reed, our headache specialist. She is asking for a referral to rheumatology as well for her fibromyalgia. She is filing for disability. She will follow with psychiatry as well.

(*Id.* at 616.)

On January 22, 2018, Sayre saw Allen Segal, D.O., to establish care for her fibromyalgia and back

problems.  (*Id.* at 506-07.)  Sayre told Dr. Segal she was there for Social Security disability.  (*Id.* at 510.)

Sayre reported her medications provided minimal relief from her symptoms.  (*Id.*)  On examination, Dr.

Segal found normal finger-nose touch, normal sensation, no weakness, and no focal findings.  (*Id.* at 513.)

During the rheumatology examination, Dr. Segal found full range of motion, no pain, no edema, no

deformity, tight thoracic and lumbar paraspinals, normal range of motion of the cervical and lumbar spine

without pain, no active synovitis, muscle atrophy, or weakness, normal gait, and normal movement of all

extremities.  (*Id.*)  Dr. Segal noted Sayre requested a muscle relaxer her primary care physician refused to

prescribe, so he gave her a prescription for Flexeril to use when needed.  (*Id.* at 519.)

On March 28, 2018, Sayre saw Gheorghe Ignat, M.D., regarding her joint pain, joint stiffness, and

back and neck pain.  (*Id.* at 524.)  Dr. Ignat diagnosed Sayre with reflex sympathetic dystrophy ("RSD"),

fibromyalgia, and costochondritis.  (*Id.*)  Dr. Ignat noted that after a motor vehicle accident, Sayre was left

"with a deformed foot, and chronic pain, intermittent swelling, and purple discoloration of the foot, leg,

when she stands or sits."  (*Id.* at 525.)  Sayre also complained of knee pain when standing or walking.

(*Id.*)  Dr. Ignat noted Sayre was unable to work.  (*Id.*)  On examination, Dr. Ignat found purple

9

discoloration of the right foot, increased sweating, and allodynia, normal muscle strength of the upper and lower extremities, normal sensation, and no edema.  (*Id.*)  During the rheumatology examination, Dr. Ignat found normal flexion, extension, and lateral bending of the cervical spine, normal range of motion and no tenderness of the lumbar spine, negative straight leg raise, normal range of motion and no tenderness of the anatomical landmarks of the shoulders, normal range of motion of the elbows and hands, normal range of motion and no trochanteric bursa tenderness of the hips, normal range of motion and tenderness of the knees, normal range of motion and no pain or swelling of the ankles, and "severe" deformity of the right foot with ankylosis in most of the joints.  (*Id.* at 525-26.)  Dr. Ignat wrote the following regarding fibromyalgia tender points: "trapezius, second ribs, lateral epicondyles, greater trochanter, knees, gluteal, para spinal cervical lumbar."  (*Id.* at 526.)

On April 11, 2018, Sayre saw Dr. Ignat for follow up.  (*Id.* at 521.)  During this visit, Dr. Ignat added the diagnosis of abnormal antinuclear antibody titer.  (*Id.*)  Dr. Ignat noted Sayre had low Vitamin D, positive ANA, and normal ESR and CRP.  (*Id.* at 522.)  Sayre complained of new left arm pain and numbness.  (*Id.*)  Dr. Ignat's examination findings, including fibromyalgia tender points, remained unchanged from Sayre's January 2018 visit.  (*Id.* at 522-23.)

On October 16, 2018, saw David Brager, APRN, CNP, for a follow up visit.  (*Id.* at 629.)  Sayre reported her sleep was better, although she had trouble falling asleep and staying asleep.  (*Id.*)  Sayre described her appetite as "okay" and told Brager she ate one meal a day.  (*Id.*)  Brager described Sayre's mood as irritable because of her boyfriend, being stressed out, and a lot of things going on with her family.  (*Id.*)  Sayre reported "not missing many doses" of her medication during the week, and felt her medications were working well.  (*Id.*)  Sayre denied suicidal and homicidal ideation.  (*Id.*)  On examination, Brager found Sayre was generally relaxed and engaged with an appropriate affect, calm motor activity, unremarkable speech, good eye contact, neutral reported mood, unremarkable thought

10

content and process, unremarkable perception, appropriate insight and judgment, grossly intact memory, and average intellect.  (*Id.* at 630.)

On January 9, 2019, Dr. Ignat completed a Physical Medical Source Statement.  (*Id.* at 591-96.) Dr. Ignat listed Sayre's diagnoses as anxiety, depression, RSD, and fibromyalgia.  (*Id.* at 591.)  Dr. Ignat noted Sayre was unable to work because of right knee pain, swelling, and right leg pain.  (*Id.*)  Dr. Ignat opined Sayre could sit for ten minutes, stand for ten minutes, and sit and stand/walk for a total of less than two hours in an eight-hour workday.  (*Id.* at 593.)  Dr. Ignat further opined Sayre did not need to walk around during an eight-hour workday.  (*Id.*)  Sayre would need to take unscheduled two hour breaks every half an hour because of muscle weakness and pain, paresthesias, and numbness.  (*Id.*)  Dr. Ignat opined Sayre would need to elevate her legs to thirty degrees for 80% of an eight-hour workday because of numbness and pain.  (*Id.* at 593-94.)  Sayre could occasionally lift less than 10 pounds, rarely lift ten pounds, and never lift greater than 10 pounds.  (*Id.* at 594.)  Dr. Ignat opined Sayre had significant limitations in reaching, handling, and fingering.  (*Id.*)  Sayre could grasp, turn, and twist objects, perform fine manipulation, and reach overhead for 10% of an eight-hour workday.  (*Id.*)  Sayre could reach in front of her body for 20% of an eight-hour workday.  (*Id.*)  Dr. Ignat opined Sayre would be off task 25% or more during an eight-hour workday and was incapable of even low stress work because of her history. (*Id.* at 594, 596.)  Dr. Ignat further opined Sayre would have good days and bad days and would miss more than four days of work a month.  (*Id.* at 596.)

On January 16, 2019, Sayre saw Elizabeth Pettit, APRN, PMHNP-BC, for a follow up visit.  (*Id.* at 634.)  Sayre reported she had been adherent to her prescriptions.  (*Id.*)  Sayre reported her sleep was better, although she had trouble falling asleep and staying asleep at times.  (*Id.*)  Sayre described her appetite as "okay" and told Pettit she ate one meal a day.  (*Id.*)  Pettit described Sayre's mood as irritable because of being stressed out and a lot of things going on with her family.  (*Id.*)  Sayre reported "not

missing many doses" of her medication during the week, and felt her medications were working well most of the time.  (*Id.*)  Pettit noted Sayre met the criteria for PTSD and generalized anxiety disorder.  (*Id.*)  Sayre denied suicidal and homicidal ideation.  (*Id.* at 635.)  On examination, Pettit found Sayre had an appropriate appearance and hygiene with a steady, slow, and purposeful gait because of her foot and back pains.  (*Id.* at 635.)  Sayre was generally relaxed and engaged with an appropriate affect, calm motor activity, unremarkable speech, good eye contact, neutral reported mood, unremarkable thought content and process, unremarkable perception, appropriate insight and judgment, grossly intact memory, and average intellect.  (*Id.*)  Pettit found no internal stimulation and noted no delusions were noted or expressed.  (*Id.* at 636.)  Sayre reported she was "feeling ready to do more and feel better about [herself]."  (*Id.*)

That same day, Pettit completed a Mental Impairment Questionnaire.  (*Id.* at 598-600.)  Sayre's diagnoses included major depressive disorder, recurrent, PTSD, and generalized anxiety disorder.  (*Id.* at 598.)  Pettit described Sayre's prognosis as limited.  (*Id.*)  Pettit opined Sayre would be unable to meet competitive standards in the following areas: asking simple questions or requesting assistance and accepting instructions and responding appropriately to criticism from supervisors.  (*Id.* at 600.)  Pettit further opined Sayre's abilities were seriously limited, but not precluded, in the following areas: carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; remembering locations and work-like procedures; understanding and remembering detailed instructions; interacting appropriately with the general public; getting along with coworkers or peers without distracting them or exhibiting behavior extremes; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness.  (*Id.* at 598, 600.)  Pettit further opined Sayre would have limited

12

but satisfactory abilities in the following areas: carrying out very short and simple instructions; managing regular attendance and being punctual within customary intolerances; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; understanding and remembering very short and simple instructions; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; and setting realistic goals or make plans independently of others.  (*Id.*)  Pettit stated it was unknown how often Sayre would be absent from work and estimated Sayre would be off-task 25% of an eight-hour workday but noted she was not able to quantify the amount.  (*Id.* at 600.)

**C.      State Agency Reports**

**1.      Mental Impairments**

On October 26, 2017, Karen Terry, Ph.D., found Sayre had moderate limitations in her abilities to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (*Id.* at 130.)  Dr. Terry stated the previous ALJ's PRTF was not being adopted because there had been a change to the policies and procedures used to evaluate psychological symptoms.  (*Id.*)  Dr. Terry opined Sayre had the ability to understand, remember, and carry out simple and occasionally complex tasks.  (*Id.* at 134.)  She could "maintain attention, make simple decisions, and adequately adhere to a schedule in a work environment without strict time limitations or production demands."  (*Id.*)  Sayre could relate adequately on a superficial basis in a work environment with infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervision.  (*Id.*)  Dr. Terry further opined Sayre could complete tasks where there is no more than occasional change and where changes can be explained.  (*Id.*)  Dr. Terry stated the MRFC was an adoption of the previous ALJ decision based on AR 98-4.  (*Id.*)

13

On May 23, 2018, Cynthia Waggoner, Psy.D., affirmed these findings on reconsideration.  (*Id.* at 153.)

### 2. Physical Impairments

On October 9, 2017, Leigh Thomas, M.D., opined that Sayre could lift 20 pounds occasionally and 10 pounds frequently, stand/walk for a total of four hours per workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 132.)  Sayre could not operate foot controls with her right lower extremity. (*Id.*)  Dr. Thomas opined Sayre could occasionally climb ramps/stairs but could never climb ladders, ropes, or scaffolds.  (*Id.* at 133.)  Sayre's ability to balance, stoop, kneel, crouch, and crawl was unlimited. (*Id.*)  Sayre must avoid exposure to workplace hazards.  (*Id.* at 134.)  Dr. Thomas stated the previous ALJ's RFC was not being adopted because of Sayre's new diagnosis of cervical spine spondylosis, but noted the limitations opined "closely mirror[ed] the limitations set by the ALJ."  (*Id.*)

On May 24, 2018, William Bolz, M.D., on reconsideration noted updated medical records had been received which showed severe right foot deformity with ankylosis of most joints, fibromyalgia, and tender points.  (*Id.* at 152.)  As a result, Dr. Bolz limited Sayre to frequent balancing, crouching, and crawling.  (*Id.* at 153.)

## D. Hearing Testimony

During the March 20, 2019 hearing, Sayre testified to the following:

- Sayre testified her conditions had remained the same since 2016; they had not worsened or improved.  (*Id.* at 74.)  However, she had a new diagnosis of RSD.  (*Id.* at 75.)

- Her right leg swells from her knee down into her calves, and her foot swells sometimes too.  (*Id.*)  She has osteochondritis desiccant in her right knee.  (*Id.*)  She does not have a lot of blood flow, and because she has no cartilage and a hole in her kneecap, she has bad circulation.  (*Id.*)  Her leg goes purple within five minutes of sitting or standing.  (*Id.*)  She cannot even do the dishes.  (*Id.* at 76.)  When her leg goes purple, she loses all feeling in her toes.  (*Id.*)  Her right foot felt numb during the hearing.  (*Id.*)  Elevating her leg to heart level alleviates the swelling.  (*Id.*)  She has to elevate her foot all day.  (*Id.*)  When her foot gets cold, she loses feeling in her

foot, and needs to sit and rub it or put it in very hot water to get feeling back in her foot.  (*Id.*)

- She does not do anything all day.  (*Id.*)  She lays in her room all the time watching TV.  (*Id.* at 77.)  She has to wear very light shoes and cannot have them tied very tight or it causes her to lose feeling in her feet and makes her toes go numb.  (*Id.*)  She cannot walk flat on her foot and has to walk on the outside of her foot.  (*Id.*)  Her surgeon had to use putty plaster to build her foot back up so she could even wear shoes.  (*Id.*) She cannot stand in the shower and has to use a shower chair.  (*Id.* at 78.)  It is hard for her to brush her hair because of her neck pain.  (*Id.*)  Her mom takes care of her every day.  (*Id.*)  She does not cook.  (*Id.*)  She cannot drive because it is her right foot that is deformed.  (*Id.*)  She lives with her mother.  (*Id.*)

- She has pain every day.  (*Id.*)  She has pain throughout her whole body because of her fibromyalgia and then injuring her neck, spine, and right hip in the accident.  (*Id.*)  Her pain is an 8-9/10 most days.  (*Id.* at 79.)

- She cannot work a sit-down job or a job that allowed her to alternate between sitting and standing because she cannot sit without elevating her leg, or else her leg goes purple and she loses feeling in her whole foot.  (*Id.*)  She cannot stand for long periods of time.  (*Id.* at 80.)  She cannot move around very well and needs to be careful about how she steps because of her foot injury.  (*Id.*)

- Helicopters and sirens cause her to flash back to her accident.  (*Id.* at 81.)  She gets anxiety or panic attacks when she hears them; she starts to hyperventilate, and her chest feels tight.  (*Id.*)  She is depressed all the time and cries a lot.  (*Id.* at 82.)  She cannot focus on any one thing for too long, and her mind bounces around from one thing to the next.  (*Id.*)  She has short-term memory problems since the accident.  (*Id.* at 83.)

The ALJ then posed the following hypothetical question:

> All right.  Mr. Anderson, assume an individual who can engage in light exertion, but is limited to standing and/or walking up to four hours a day; this individual can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; cannot operate foot controls with the right lower extremity; should avoid exposure to workplace hazards defined as industrial machinery, unprotected heights, commercial driving, and uneven terrain; this individual – I'm also going to add avoid concentrated exposure to extreme cold, heat, humidity, and wetness; as for mental, this individual is limited to simple, routine, type work; no mechanized work for – no mechanized pace I should say, no mechanized pace – i.e., no piece-rate type work; can interact with others to speak, signal, take instructions, and serve; can adjust up to occasional changes – you know what, I think routine says it all, so I'm not going to provide that additional.  I think it's just superfluous.  Limited to simple, routine work; no mechanized pace; no piece-rate type work; can interact with others to speak, signal, take instructions, and serve.  Mr. Anderson, are there any jobs for such an individual?

15

(*Id.* at 83-84.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as mail clerk, electronics worker, and inspector and hand packager. (*Id.* at 84.) The VE further testified these jobs could be done sitting or standing. (*Id.*)

The ALJ then modified the hypothetical to change the exertion level to sedentary. (*Id.*) The VE testified the hypothetical individual could perform representative jobs in the economy, such as touch-up screener, ampoule sealer, and patcher. (*Id.* at 84-85.)

The ALJ next modified the hypothetical to state the hypothetical individual would be off task up to 15% of the workday. (*Id.* at 85.) The VE testified up to 15% off task during the workday would be tolerated, but anything beyond that was work preclusive. (*Id.* at 86.)

The ALJ then modified the hypothetical to state the hypothetical individual would miss one workday a month, would come in late one day a month, and would leave work early one day a month. (*Id.*) The VE testified such absences would exceed acceptable tolerance. (*Id.*)

### III. STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that

16

"significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since August 22, 2017, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: partial amputation of right great toe and first metatarsal; osteochondritis; complex regional pain syndrome; headaches; major depressive disorder; and anxiety (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she is limited to standing or walking up to 4 hours a day; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; cannot operate foot controls with the right lower extremity, must avoid exposure to workplace hazards defined as industrial machinery, unprotected heights, commercial driving, and uneven terrain; and avoid concentrated exposure to extreme cold, heat, humidity, and wetness. Regarding her mental limitations, the claimant is limited to simple routine type work, no mechanized pace, i.e., no piece rate type work; and can interact with others to speak, signal, take instructions, and serve.

17

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on August **, 1992 and was 24 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since August 22, 2017, the date the application was filed (20 CFR 416.920(g)).

(Tr. 19-33.)

# V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

18

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734,

2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In asserting the ALJ failed to "properly evaluate the cumulative evidence in the record," Sayre asserts the ALJ erred in determining her fibromyalgia was not a medically determinable impairment. (Doc. No. 13 at 15-16.)  Sayre maintains that since treatment notes from Dr. Ignat showed fourteen of the requisite tender points, her fibromyalgia and related pain "should have been considered severe impairments." (Doc. No. 15 at 2.)

The Commissioner responds that the ALJ found Dr. Ignat's fibromyalgia diagnosis did not meet the criteria in Social Security Ruling ("SSR") 12-2p after "correctly not[ing] that Dr. Ignat did not identify the required 11 out of 18 tender points required to satisfy the ruling." (Doc. No. 14 at 14-15.)  The Commissioner further argues that Sayre "does not even attempt to argue that she meets the other criteria outlined in SSR 12-2p." (*Id.* at 15.)  For these reasons, the Commissioner maintains, substantial evidence supports the ALJ's finding that fibromyalgia was not a severe impairment. (*Id.*)

The Social Security Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques.  *See* 20 CFR § 416.921; Social Security Ruling ("SSR") 96–4P, 1996 WL 374187, at *1 (SSA July 2, 1996).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings.  *Id.*

The claimant bears the burden of establishing the existence of a medically determinable impairment.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.")  *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Here, the ALJ determined, at Step Two, that Sayre suffered from the severe impairments of partial amputation of right great toe and first metatarsal, osteochondritis, complex regional pain syndrome, headaches, major depressive disorder, and anxiety.  (Tr. 20.)  The ALJ determined Sayre's fibromyalgia did not constitute a "medically determinable impairment" for the following reasons:

> The claimant also alleges that she has disabling symptoms from fibromyalgia, and has reported this condition to several providers (5F/3; 6F/9; 7F/2-3, 5; 9F/l). In evaluating cases involving possible involvement of fibromyalgia, the undersigned is guided by SSR 12-2p. The law recognizes two different diagnostic criteria. The first requires 11 positive tender points out of 18, a three month history of generalized pain, and evidence that other disorders had been excluded. The second requires a history of widespread pain, repeated manifestation of at least six fibromyalgia signs or symptoms, and evidence that other disorders had been excluded. In addition, the diagnosing physician must have done a review of the claimant's record. (SSR 12- 2p) In this case, there is no evidence to support the required findings pursuant to SSR 12-2p. Specifically, the undersigned notes that Dr. Ignat includes a note from March 28, 2018 and April 11, 2018 appointments indicating the following Fibromyalgia tender points: "trapezius, second ribs, lateral epicondyles, greater tronchanter, knees, gluteal, para spinal cervical lumbar" (B9F; Bl0F; Bl 7F). However, Dr. Ignat's note does not identify the required 11 out of 18 tenderpoints to satisfy the diagnostic criteria for fibromyalgia pursuant to SSR 12-2p. Furthermore, Dr. Ignat's notes are inconsistent with the physical examination findings from the same appointments where he notes shoulder range of motion is normal, no tenderness of anatomical landmarks in the shoulders; hips have a normal range of motion and no trochanteric bursa tenderness; and her knees have no effusions, present tenderness, normal alignment and range of motion (Bl0F/22-23; Bl 7F/5-7). As such, the undersigned must find that the evidence of record taken as a whole does not support a finding of fibromyalgia as a medically determinable impairment.

(*Id.*)  The only additional mention of fibromyalgia in the decision is the following statement in the ALJ's RFC analysis: "The claimant also reports having been diagnosed with fibromyalgia at age 12, however as

discussed above the records do not support a diagnosis for fibromyalgia per SSR 12-2p (B26F/11)." (*Id.* at 24.)

The Court finds the ALJ failed to properly analyze Sayre's fibromyalgia. Social Security Ruling ("SSR") 12-2p describes fibromyalgia ("FM") as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12–2p, 2012 WL 3104869, at *2. SSR 12–2p explains fibromyalgia is a "common syndrome" and that a person's symptoms must be considered when the agency decides if the individual has a medically determinable impairment ("MDI") of fibromyalgia ("FM"). *Id.* Pursuant to the Ruling, "FM is an MDI when it is established by appropriate medical evidence," and the disease "can be the basis for a finding of disability." *Id.* Only a licensed physician can provide evidence of an MDI of FM, but the physician's diagnosis alone is insufficient. *Id.* Rather, the evidence must "document that the physician reviewed the person's medical history and conducted a physical exam." *Id.* The agency will "review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities." *Id.*

The Agency will find that a person has a medically determinable impairment of fibromyalgia if a physician diagnosed fibromyalgia and provides the evidence described under § II.A or § II.B of the Ruling, and the physician's diagnosis is not inconsistent with the other evidence in the individual's case record. *Id.* Under § II.A, the agency "may find that a person has an MDI of FM if he or she has all three of the following":

1. A history of widespread pain-that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) that has persisted (or that persisted) for at least 3 months and which "may fluctuate in intensity and may not always be present;"

2.      "At least 11 positive tender points on physical examination" which must be found in specified locations;[3] and

3.      Evidence that other physical and mental disorders that could cause the symptoms or signs were excluded, such as "imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor)."

*Id.* at **2–3. Alternatively, a person may be found to have a medically determinable impairment of fibromyalgia under § II.B of SSR 12-2p if he has all three of the following criteria:

1. A history of widespread pain as described under § II. A;

2. "Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome;" and

3. Evidence that "other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded."

*Id*. at *3. Co-occurring conditions include "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome." *Id*. at n.10.

Here, in a blanket statement, the ALJ found Dr. Ignat's treatment notes detailing Sayre's tender points did not show 11 out of 18 tender points as required; however, the ALJ failed to *explain* how that was the case considering the number of locations Dr. Ignat found tender points. (Tr. 20.)

---

[3] SSR 12–2p requires a finding of "[a]t least 11 positive tender points [which] must be found bilaterally (on the left and right sides of the body) and both above and below the waist" and which are located on each side of the body. SSR 12–2p, 2012 WL 3104869, at *3. The tender points are located at the following 18 sites: occiput (base of the skull); low cervical spine (back and side of the neck); trapezius muscle (shoulder); supraspinatus muscle (near the shoulder blade); second rib (top of the rib cage near the sternum or breast bone); lateral epicondyle (outer aspect of the elbow); gluteal (top of the buttock); greater trochanter (below the hip); and inner aspect of the knee. *Id*. The Ruling provides that in performing the testing, "the physician should perform digital palpation with an approximate force of 9 pounds (approximately the amount of pressure needed to blanch the thumbnail of the examiner). The physician considers a tender point to be positive if the person experiences any pain when applying this amount of pressure to the site." *Id*. at § II.A.2.b.

While the ALJ further found Dr. Ignat's treatment notes inconsistent with the physical examination Dr. Ignat performed, the ALJ's explanation for such a determination is inadequate and fails to build the requisite accurate and logical bridge from the evidence to the ALJ's conclusion. First, it is unclear to the Court, without more, how Dr. Ignat's findings of "no tenderness of anatomical landmarks in the shoulders" and "no trochanteric bursa tenderness" is inconsistent with his finding tender points of the trapezius and greater trochanter. (*See id.*) Second, contrary to the ALJ's determination, on examination Dr. Ignat found tenderness present in the knees. (*Id.* at 20, 525-26.) Finally, the ALJ relied on the normal range of motion of the shoulders, hips, and knees to support her conclusion that Dr. Ignat's exam findings undercut his treatment notes. (*Id.* at 20.) It is clear, however, that the lack of "objective" medical evidence is not unusual, but rather the norm in fibromyalgia cases. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007) (noting that CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity"); *Preston v. Sec'y of Health & Human Svcs.*, 854 F.2d 815, 817-818 (6th Cir. 1988) (stating that "[t]here are no objective tests which can conclusively confirm" fibromyalgia); *Keating v. Comm'r of Soc. Sec.*, No. 3:13-CV-487, 2014 WL 1238611, at *6 (N.D. Ohio March 25, 2014) ("This circuit has recognized that symptoms of fibromyalgia are often not supportable by objective medical evidence"); *Schlote v. Astrue*, No. 1:11-cv-01735, 2012 WL 1965765, at *6 (N.D. Ohio May 31, 2012). Similarly, the fact that physical examinations often yielded normal findings is not necessarily inconsistent with fibromyalgia. Indeed, the Sixth Circuit has repeatedly and consistently recognized that fibromyalgia patients typically "manifest normal muscle strength and neurological reactions and have a full range of motion." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861-862 (6th Cir. 2011) (citing *Preston*, 854 F.2d at 820). *See also Starcher v. Comm'r of Soc. Sec.*, No. 2:15-cv-3113, 2016 WL 5929048, at *6 (S.D. Ohio Oct. 12, 2016) ("As SSR 12-2p indicates, and as the case law has established, a fibromyalgia sufferer can present to a physician without any significant

24

objective signs or symptoms*.")*; *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 434 (6th Cir. 2013) (noting fibromyalgia claimants "demonstrate normal muscle strength and neurological reactions and can have a full range of motion"); *Keating*, 2014 WL 1238611, at *6.

Moreover, the ALJ failed to consider whether the medical evidence demonstrated Sayre satisfied the criteria for fibromyalgia under § II.B of SSR 12-2p.[4]  Under that section, a claimant's fibromyalgia is considered an MDI if she has (1) a history of widespread pain; (2) "repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome;" and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.  The ALJ's failure to consider whether Sayre satisfied the criteria set forth in § II.B is problematic because there is evidence in the treatment records that could support such a finding, including evidence documenting Sayre's long-standing complaints of all-over body pain, migraines, fatigue, depression, anxiety, and memory problems.  (*See, e.g.,* Tr. 297-98, 435, 441, 443, 447-48, 452, 456, 524-25, 613, 629.)

As this Court has noted on previous occasions, "[it] is incumbent upon the ALJ to apply the correct standard under existing Sixth Circuit precedent" when evaluating fibromyalgia claims.  *Schlote*, 2012 WL 1965765, at *6.  Here, the ALJ failed to properly analyze Sayre's fibromyalgia at Step Two, which, in turn, improperly influenced the ALJ's analysis of Sayre's limitations in her RFC analysis.  As other courts have explained, "[t]he error is therefore not harmless, or, at least, the Commissioner has not carried the burden of showing that it was, and a remand is required in order for the ALJ properly to evaluate the case

---

[4] While the Commissioner argues Sayre failed to assert she met the other diagnostic criteria, the Commissioner does not – and indeed, cannot – offer any explanation excusing the ALJ's failure to consider this portion of SSR 12-2p.

in light of the diagnosis of fibromyalgia." *Starcher*, 2016 WL 5929048, at *6. *See also Howell*, 2018 WL 565682, at *12.

Accordingly, this matter is remanded for further evaluation of Sayre's fibromyalgia as a medically determinable impairment and to re-evaluate the physical limitations in the RFC.

As this matter is being remanded for further proceedings for proper consideration of the record, and in the interests of judicial economy, the Court will not address Sayre's remaining assignments of error

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

**IT IS SO ORDERED.**

Date: April 9, 2021                           *s/ Jonathan Greenberg*
                                              Jonathan D. Greenberg
                                              United States Magistrate Judge